UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| DAY DISTRIBUTING CO.,<br>a Minnesota corporation;<br>MARK VII DISTRIBUTORS, INC.,<br>a Minnesota corporation;<br>SANDSTONE DISTRIBUTING CO., INC.,<br>a Minnesota corporation;<br>NEEDHAM DISTRIBUTING CO., INC.,<br>a Minnesota corporation;<br>and ROHLFING OF DULUTH, INC.,<br>a Minnesota corporation,<br><br>     Plaintiffs,<br><br>v.<br><br>NANTUCKET ALLSERVE, INC.,<br>f/k/a Stewart's Beverages, LLC and d/b/a<br>Cadbury Schweppes Americas Beverages,<br><br>     Defendant. | Case No. 07-CV-1132 (PJS/RLE)<br><br><br><br><br><br>ORDER GRANTING DEFENDANT'S<br>MOTION FOR SUMMARY JUDGMENT |

  Richard M. Dahl, Amy L. De Kok, and Michael D. Madigan, MADIGAN DAHL & HARLAN, PA, for plaintiffs.

  William L. Killion, Elizabeth L. Taylor, and Jacob R. Kraus, FAEGRE & BENSON LLP, for defendant.

  Defendant produces a line of upscale sodas. Plaintiffs distributed defendant's sodas in Minnesota. In December 2006, defendant took its distribution operations in-house and terminated plaintiffs' distributorship agreements. Plaintiffs sued, accusing defendant of violating the Minnesota Franchise Act, and also bringing claims of breach of contract, unjust enrichment, tortious interference with existing and prospective contractual relationships, equitable estoppel, and breach of the implied covenant of good faith and fair dealing.

  Defendant has moved for summary judgment on all of plaintiffs' claims. For the reasons set forth below, the motion is granted, and plaintiffs' amended complaint is dismissed.

I.  BACKGROUND

Defendant Nantucket Allserve, Inc. produces a line of upscale sodas known as "Stewart's." Defendant does business under the "family name" of Cadbury Schweppes Americas Beverages. Following the practice of the parties, the Court will refer to defendant and its predecessors as "Cadbury."

Plaintiffs are beverage distributors who distributed Stewart's sodas in Minnesota. Three of the plaintiffs — Day Distributing Co. ("Day"), Mark VII Distributors, Inc. ("Mark VII"), and Needham Distributing Co., Inc. ("Needham") — began distributing Stewart's in the late 1980s or early 1990s. Warner Dep. 22, 46; Ryan Dep. 12; Needham Dep. 27. These three plaintiffs did not have written distributorship agreements with Cadbury. The remaining two plaintiffs — Sandstone Distributing Co., Inc. ("Sandstone") and Rohlfing of Duluth, Inc. ("Rohlfing") — began as "sub-distributors" of Stewart's. In other words, Sandstone and Rohlfing initially did not get Stewart's from Cadbury, but instead from distributors of Stewart's. In the early 2000s, though, Sandstone and Rohlfing started buying directly from Cadbury. Watrin Dep. 14, 17; Spehar Dep. 21, 25, 28. Unlike the other plaintiffs, Sandstone and Rohlfing did have written distributorship agreements with Cadbury. De Kok Aff. Exs. L, M.

Sandstone's and Rohfling's distributorship agreements provided that they could be terminated without cause. De Kok Aff. Ex. L § 2; *id.* Ex. M § 2. At the end of the initial term, Sandstone's and Rohlfing's agreements automatically renewed for one year, and the agreements continued to renew each year unless either party provided at least thirty days' written notice of a desire to terminate the agreement. De Kok Aff. Ex. L § 2; *id.* Ex. M § 2. The agreements also set minimum-purchase requirements; specifically, they required that, at the end of every quarter, the distributor must have purchased at least one thousand cases of Stewart's during the previous

twelve months. De Kok Aff. Ex. L § 10(9); *id.* Ex. M § 10(9). The other three plaintiffs did not have minimum-purchase requirements, but they did have annual sales goals set by Cadbury. Ryan Dep. 48-49.

As distributors of Stewart's sodas, plaintiffs participated in various promotional activities in cooperation with Cadbury. Cadbury assigned an annual marketing budget to each distributor; this represented the amount of money that Cadbury was willing to spend to market Stewart's in that distributor's territory. (Cadbury did not disclose the budgeted amount to the distributor.) Cadbury then created a calendar of marketing activities, which included price discounts, print advertising, and promotional displays. With respect to many of these programs, Cadbury would offer to share (or "co-op") the cost. For example, Cadbury would propose giving a particular retailer a $2 discount for a period of time, and Cadbury would offer to absorb $1 of that discount if the distributor would absorb the other $1. The expense incurred by Cadbury would be deducted from the marketing budget assigned to the distributor.

The plaintiffs argue that, because Cadbury negotiated marketing plans (and, in particular, price discounts) directly with retailers, the distributors as a practical matter had no choice about participating. But it is undisputed that some of the distributors did refuse to participate in discount programs when they thought that the discounts negotiated by Cadbury were too steep. Ryan Dep. 55-57. When that happened, Cadbury would either cancel the program or absorb the entire cost of the discount itself. Ryan Dep. 65; Warner Dep. 210. The parties agree that Mark VII often acted as the "bellwether" for the Minnesota retailers; when Mark VII decided not to participate in a program because it was too costly, the other distributors often followed suit. Ryan Dep. 85. Cadbury also responded to Mark VII's concerns about the impact of discount programs on its profit margin by reducing the number of discount programs. Ryan Dep. 84-85.

Sometime in 2003 (if not earlier), Cadbury began exploring the possibility of bringing its distribution of Stewart's in-house.  Gennarelli Dep. 75-78.  In October 2006, after spending about three years studying the issue, Cadbury decided that it would be more profitable for it to distribute Stewart's directly rather than to rely on "middlemen."  Cadbury notified its outside distributors — including plaintiffs — that their agreements with Cadbury would terminate as of the end of 2006.  Def.'s Exs. 11-15; Gennarelli Dep. 87-88.  Plaintiffs then commenced this action in January 2007 in Minnesota state court.  Cadbury removed the action to federal court and now seeks summary judgment.

## I.  ANALYSIS

### *A.  Standard of Review*

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for either party.  *Ohio Cas. Ins. Co. v. Union Pac. R.R.*, 469 F.3d 1158, 1162 (8th Cir. 2006).  In considering a motion for summary judgment, a court "must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the non-moving party."  *Winthrop Res. Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 468 (8th Cir. 2004).

*B. Minnesota Franchise Act*

The Minnesota Franchise Act ("MFA") protects franchisees from being terminated without good cause by franchisors. Minn. Stat. § 80C.14, subd. 3(b). Cadbury does not argue that it had "good cause" to terminate plaintiffs' distributorship agreements. Instead, Cadbury argues that it did not need "good cause" because it was not a franchisor and plaintiffs were not franchisees for purposes of the MFA.

The MFA defines "franchise" in several alternative ways. Plaintiffs rely on two of those definitions: They claim that they are franchisees because Cadbury sold Stewart's sodas to them for the purpose of enabling them to "start a business" and because they paid an indirect "franchise fee" to Cadbury. The Court considers each argument in turn.

1. The "Business Opportunity" Provision

Plaintiffs first contend that they are franchisees under the "business opportunity" provision of the MFA. *See* Minn. Stat. § 80C.01, subd. 4(a)(3).[1] In relevant part, that provision defines a "franchise" as:

> the sale or lease of any products, equipment, chattels, supplies, or services to the purchaser . . . for the purpose of enabling the purchaser to *start a business* and in which the seller:
>
> . . .
>
> (iii) guarantees that the purchaser will derive income from the business which exceeds the price paid to the seller[.]

---

[1]Plaintiffs evidence some confusion about the MFA when they argue that the business-opportunity provision is a way to establish that they *paid a franchise fee*. The MFA defines several alternative, stand-alone types of franchises. Payment of a franchise fee is necessary to establish the existence of a franchise under subdivision 4(a)(1) (discussed below), but it is not necessary to establish the existence of a franchise under the business-opportunity provision (subdivision 4(a)(3)).

Minn. Stat. § 80C.01, subd. 4(a)(3) (emphasis added).  Plaintiffs contend that they fall squarely within this definition because Cadbury sold Stewart's sodas to them so that they could start a new business.  Specifically, plaintiffs argue that they were in the business of distributing beer, but then Cadbury sold Stewart's sodas to them so that they could start the new business of distributing premium, upscale sodas.[2]

Neither the parties nor the Court have found any case law interpreting the business-opportunity provision of the MFA.  In particular, neither the parties nor the Court has found any opinion addressing the meaning of "start a business" for purposes of the MFA.  But both sides have cited cases from other jurisdictions interpreting similar business-opportunity statutes.  A review of these cases — and consideration of the commonly understood meaning of "start a business" — suggest that "start a business" does not have the broad meaning claimed by plaintiffs.

Plaintiffs cite a number of cases in which a purported franchisor was found to have sold products or services to a purported franchisee for the purpose of enabling the franchisee to start a business.  In most of these cases, however, the purported franchisor advertised business opportunities to the general public — and, in response, persons who were not previously established in that business (or, for that matter, in *any* business) paid money for products or services to start a new business.  *Cf. Tousley v. N. Am. Van Lines, Inc.*, 752 F.2d 96, 99 (4th Cir. 1985); *Martin v. Pilot Indus.*, 632 F.2d 271, 273 (4th Cir. 1980); *Adams v. State*, 443 So.2d 1003, 1003-04 (Fla. Dist. Ct. App. 1983).  In other cases cited by plaintiffs, the "new" business

---

[2]Plaintiffs also argue that Cadbury guaranteed that they would earn a profit from distributing Stewart's.  The Court assumes that plaintiffs are correct for purposes of ruling on Cadbury's summary-judgment motion.

involved products or services that were completely different from the products or services that the plaintiffs were already in the business of selling — for example, a case in which linoleum distributors purchased the right to sell subscriptions to a monthly video marketing magazine, *Fineman v. Armstrong World Indus., Inc.*, 774 F. Supp. 225, 236-37 (D.N.J. 1991), *rev'd in part on other grounds*, 980 F.2d 171 (3d Cir. 1992), and a case in which a group of ophthalmologists purchased the right to distribute a computerized medical-billing system, *Eye Assocs., P.C. v. IncomRx Sys. Ltd. P'ship*, 912 F.2d 23, 25 (2d Cir. 1990).

The facts of this case are far removed from those cases. Plaintiffs were well-established distributors of beer before Cadbury ever approached them. Plaintiffs already owned the facilities (warehouses, refrigerators) and equipment (trucks, handcarts), and already employed the personnel (drivers, warehouse workers, bookkeepers), needed to distribute beverages. Cadbury did not offer plaintiffs an opportunity to *start* a business; Cadbury offered them an opportunity to add a *line of products* to an already-existing business. Cadbury essentially told plaintiffs: "When your trucks are out delivering beer, they should also deliver Stewart's sodas."

True, there is language in some cases cited by plaintiffs suggesting that the addition of somewhat similar product lines may be considered new business. *See, e.g.*, *Eye Assocs.*, 912 F.2d at 27 (noting a decision by the Connecticut Banking Commissioner that the purchase of the right to sell aircraft was a "new" business even though the purchasers were already in the business of selling other types of transportation vehicles). But whatever the ambiguities inherent in the phrase "start a business," the Court believes that it cannot be stretched to cover a situation in which an already-established beer distributorship takes on the distribution of a line of sodas. *Cf. Bunting v. Perdue, Inc.*, 611 F. Supp. 682, 688-89 (E.D.N.C. 1985) (construction of second poultry house was an expansion of an existing business, not the start of a new business).

Were the Court to hold otherwise, the scope of the MFA would be breathtakingly broad. Any time a wholesaler or retailer added a new product that could be distinguished in a minor way from its existing products — for example, a distributor of "regular" sodas that added a line of "premium" sodas, or a restaurant selling domestic beer that added a line of imported beer — that wholesaler or retailer would become a franchisee, and the supplier of the "new" product would become a franchisor, as long as the supplier made some kind of representation that selling the product would be profitable (hardly an uncommon representation).  Even a tiny convenience store could be deemed the "franchisee" of dozens of "franchisors"; a department store or grocery store could find itself in literally thousands of "franchisor-franchisee" relationships, each governed by the stringent requirements of the MFA.  Surely the Minnesota Legislature did not intend the business-opportunity provision to sweep so broadly.

The Court holds that when Cadbury sold Stewart's sodas to plaintiffs, Cadbury did not do so "for the purpose of enabling the [plaintiffs] to start a business."  Minn. Stat. § 80C.01, subd. 4(a)(3).  Plaintiffs were thus not franchisees under the business-opportunity provision of the MFA.

2.  Franchise Fee

Plaintiffs next argue that they are franchisees under Minn. Stat. § 80C.01, subd. 4(a)(1), which defines a "franchise" as follows:

> a contract or agreement, either express or implied, whether oral or written, for a definite or indefinite period, between two or more persons:
>
> > (i) by which a franchisee is granted the right to engage in the business of offering or distributing goods or services using the franchisor's trade name, trademark, service mark, logotype, advertising, or other commercial symbol or related characteristics;

> (ii) in which the franchisor and franchisee have a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise; and
>
> (iii) *for which the franchisee pays, directly or indirectly, a franchise fee*[.]

Minn. Stat. § 80C.01, subd. 4(a)(1) (emphasis added).  Cadbury disputes only the third requirement: that plaintiffs paid a franchise fee.  The MFA defines a "franchise fee" as follows:

> "Franchise fee" means any fee or charge that a franchisee or subfranchisor is required to pay or agrees to pay for the right to enter into a business or to continue a business under a franchise agreement, including, but not limited to, the payment either in lump sum or by installments of an initial capital investment fee, any fee or charges based upon a percentage of gross or net sales whether or not referred to as royalty fees, any payment for goods or services, or any training fees or training school fees or charges; provided, however, that the following shall not be considered the payment of a franchise fee:
>
> > (a) the purchase of goods or agreement to purchase goods at a bona fide wholesale price; . . . .

Minn. Stat. § 80C.01, subd. 9.

Plaintiffs admit that they did not pay what would ordinarily be considered a "franchise fee" — that is, an upfront, direct fee for the right to distribute Stewart's sodas.  Instead, plaintiffs contend that they paid indirect franchise fees in the form of co-op advertising and marketing fees, excessive minimum volume and sales requirements, and discount pricing programs.

Plaintiffs seem to suggest that the mere fact that they purchased supplies and marketing materials and participated in marketing, advertising, and discount programs establishes that they paid franchise fees.  But Minnesota courts (and federal courts applying Minnesota law) have long held that ordinary business expenses such as these are not considered franchise fees unless they are unreasonable and lack a valid business purpose.  *See Twin Cities Galleries, LLC v.*

*Media Arts Group, Inc.*, 476 F.3d 598, 601 (8th Cir. 2007) (Minnesota courts do not require a fact-intensive inquiry into how much inventory a distributor would stock in the absence of a minimum-purchase requirement, but instead apply an objective "reasonableness" standard); *R&A Small Engine, Inc. v. Midwest Stihl, Inc.*, No. 06-877, 2006 WL 3758292, at *4 (D. Minn. Dec. 20, 2006) (one-percent fee for regional advertising was a reasonable and ordinary business expense rather than a franchise fee); *RJM Sales & Mktg., Inc. v. Banfi Prods. Corp.*, 546 F. Supp. 1368, 1373 (D. Minn. 1982) (payments for wine samples and jackets, payments to outside firms for advertising material, and receipt of a commission lower than the industry average were ordinary business expenses rather than franchise fees); *Upper Midwest Sales Co. v. Ecolab, Inc.*, 577 N.W.2d 236, 242 (Minn. Ct. App. 1998) (reasonable minimum-purchase requirements and payments for tangible and intangible business assets were not franchise fees); *Banbury v. Omnitrition Int'l, Inc.*, 533 N.W.2d 876, 882 (Minn. Ct. App. 1995) (reasonable minimum-purchase requirements were not franchise fees); *Am. Parts Sys., Inc. v. T&T Auto., Inc.*, 358 N.W.2d 674, 677 (Minn. Ct. App. 1984) (evidence did not show that the inventory requirement was unreasonable and therefore it was not a franchise fee); *OT Indus., Inc. v. OT-tehdas Oy Santasalo-Sohlberg AB*, 346 N.W.2d 162, 166-67 (Minn. Ct. App. 1984) (minimum-purchase requirements and required advertising fees were ordinary and valid business expenses rather than franchise fees).

      The record is devoid of evidence that any of the marketing and advertising expenses that plaintiffs incurred were unreasonable or lacked a valid business purpose. At most, there is some evidence that Mark VII occasionally lost money on discounts to retailers. Ryan Dep. 75-76. But to say that a distributor lost money on a marketing program is not to say that the program was unreasonable or lacked a valid business purpose. Not every marketing program produces

immediate profits.  Moreover, as already noted, Mark VII objected when it thought the discounts were too steep.  Ryan Dep. 55-57.  When Mark VII agreed to participate in a discount program at a loss, it did so in the hope that the discount would help promote brand awareness — which, in turn, would increase sales.  Ryan Dep. 75-76.  Based on this record, no reasonable jury could find that the discounts and other marketing programs were unreasonable or that they lacked a valid business purpose.

The record is similarly devoid of evidence that the minimum-purchase requirements and sales goals were unreasonable or lacked a valid business purpose.  The closest plaintiffs come is evidence that, at the time Rohlfing's distributorship agreement ended, Rohlfing still had several hundred cases of Stewart's that it had not been able to sell.  Spehar Dep. 30-31.  That evidence, standing alone, means almost nothing; it is certainly not sufficient to permit a jury to conclude that the minimum-purchase requirement was unreasonable and lacked a valid business purpose.  That is particularly true in light of Rohlfing's sales figures, which demonstrate that Rohlfing generally sold more than one thousand cases per year (which was the minimum-purchase requirement).  Spehar Dep. 71-72.  Thus, all of the indirect fees that plaintiffs allege they were forced to pay were ordinary, reasonable business expenses, incurred for valid business purposes, and therefore were not franchise fees.

In addition, with the exception of the minimum-purchase requirements that applied to two of the five plaintiffs, there is no evidence that Cadbury ever told plaintiffs that they had to participate in any of these programs "for the right . . . to continue [the] business . . . ."  Minn. Stat. § 80C.01, subd. 9; *cf. Coyne's & Co. v. Enesco, LLC*, No. 07-4095, 2007 WL 3023345, at *3 (D. Minn. Oct. 12, 2007) (payment of fifty-percent markup for exclusive rights to market products was not a franchise fee because the right to enter into the business relationship was not

predicated on the payment of the markup); *Hogin v. Barnmaster, Inc.*, No. C3-02-1880, 2003 WL 21500044, at *4-5 (Minn. Ct. App. July 1, 2003) (payment of eighty-percent markup for training fee was not a franchise fee because training, although highly recommended, was not mandatory); *Bitronics Sales Co. v. Microsemiconductor Corp.*, 610 F. Supp. 550, 558-59 (D. Minn. 1985) (training fees, minimum volume requirements, prices exceeding bona fide wholesale prices, and failure to pay commissions were not franchise fees because there was no evidence that the plaintiff agreed to those conditions for the right to enter into or continue the business). To the contrary, the evidence is clear that plaintiffs did *not* have to participate in all of these programs.

As noted, Mark VII would refuse to participate in the discounts when it thought that the discounts were too steep. Ryan Dep. 56-57, 84-85. And every other plaintiff admitted that at least some of the programs were not mandatory. Ryan Dep. 105 (Mark VII was not forced to buy any point-of-sale materials); Warner Dep. 138, 206-07, 213-14 (Day could not say that any of the co-op or other payments were made in exchange for the right to continue in business, Day declined to sell to retailers at Cadbury's suggested price on at least one occasion, and Day could have declined to purchase the specialized promotional products); Needham Dep. 102-03 (admitting that Needham could have chosen not to participate in programs that it thought would be bad for business); Watrin Dep. 66-67 (Cadbury never told Sandstone that it had to order promotional products); Spehar Dep. 63-65 (Cadbury never told Rohlfing that it had to participate in discount programs and Rohlfing agreed to participate because it thought they were good for business).

Plaintiffs argue that even though Cadbury did not directly condition their right to distribute Stewart's on participation in the various marketing and discount programs, Cadbury

indirectly pressured them to participate by negotiating discounts directly with retailers before presenting the discount programs to plaintiffs. As already noted, though, plaintiffs were capable of resisting any indirect pressure; they refused to participate in discount programs when they deemed those programs inadvisable. Plaintiffs further contend that the fact that they were terminated soon after they began to refuse to participate demonstrates that participation was mandatory. But the record belies plaintiffs' argument that they were terminated for refusing to participate in marketing programs and price discounts. Instead, the undisputed evidence is that Cadbury began considering bringing the distribution of Stewart's in-house as early as 2003 and that it spent years preparing for such a step. Gennarelli Dep. 75-78. (Indeed, plaintiffs complain bitterly that Cadbury did not warn them of Cadbury's plan to bring the distribution of Stewart's in-house, even though Cadbury had worked on the plan for years.) Plaintiffs were terminated because Cadbury decided that it could make more money by distributing its product directly and cutting out the "middlemen." The MFA did not lock Cadbury into forever using outside distributors.

In sum, the Court holds that no reasonable jury could find that the co-op advertising and marketing fees, minimum volume and sales requirements, or discount pricing programs were unreasonable or lacked a valid business purpose. For that reason, the Court holds that none of the five plaintiffs was a franchisee of Cadbury for purposes of the MFA. In addition, the Court finds that no reasonable jury could conclude that plaintiffs' right to distribute Stewart's was conditioned on their payment of these fees or participation in these programs (with the exception of the minimum-purchase requirements). For that additional reason, the Court holds that Day, Mark VII, and Needham were not franchisees of Cadbury for purposes of the MFA. Cadbury is entitled to summary judgment on plaintiffs' MFA claim.

*C. Breach of Contract*

Plaintiffs argue that Cadbury breached its contracts with them by terminating them without good cause. With respect to Sandstone and Rohlfing — the two plaintiffs who had written contracts — their contracts, which were fully integrated, explicitly permitted termination without cause at the end of the initial term or any subsequent term on thirty days' written notice. There is no dispute that Cadbury provided thirty days' written notice prior to terminating Sandstone and Rohlfing. Their breach-of-contract claim must be dismissed.

With respect to the three remaining plaintiffs, plaintiffs argue that, under Minnesota law, contracts will if possible be construed so as not to permit their termination at will. *See Miller v. O.B. McClintock Co.*, 297 N.W. 724, 729 (Minn. 1941). But that principle only applies to a contract that is for a definite duration (e.g., "through December 31, 2009") yet also includes a clause that could be construed to permit termination at will. In such a case, the court will, if possible, construe the contract as a whole so as not to permit termination prior to the end date (e.g., December 31, 2009). For example, in *Miller*, the term of a license agreement was for the life of the licensed patents. *Id.* at 726. The contract also permitted termination in the event of either party's nonperformance. *Id.* The defendant rather boldly argued that, because *it* had not performed under the contract, it could terminate the contract and avoid its obligation to pay royalties. *Id.* at 728-29. Not surprisingly, the Minnesota Supreme Court rejected that argument and held instead that the clause regarding nonperformance should be construed to benefit only the nonbreaching party. *Id.* at 729.

*Miller* has no application to this case. Cadbury is not attempting to convert a contract for a definite term into a contract that is terminable at will. There is no evidence that the unwritten contracts were for anything but an indefinite duration or that Cadbury ever promised that the

distributors would be terminated only for good cause. In these circumstances, the ordinary rule that indefinite distributorship contracts are terminable at will upon reasonable notice applies. *See Elvgren Paint Supply Co. v. Benjamin Moore & Co.*, 948 F.2d 1082, 1084 (8th Cir. 1991) (per curiam) (under Minnesota law, in the absence of express or implied agreement on the duration of a distributorship, the distributorship is indefinite and is terminable at will on reasonable notice). Plaintiffs do not argue that they did not receive reasonable notice. Cadbury's motion for summary judgment is therefore granted with respect to plaintiffs' breach-of-contract claim.

### D.  Unjust Enrichment

Under Minnesota law, the elements of a claim for unjust enrichment are: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant knowingly accepted and appreciated the benefit; and (3) the circumstances render it inequitable for the defendant to retain the benefit without paying for it. *Dahl v. R.J. Reynolds Tobacco Co.*, 742 N.W.2d 186, 195 (Minn. Ct. App. 2007), *review granted* (Minn. Feb. 27, 2008). "A claim for unjust enrichment does not lie simply because one party benefits from the efforts or obligations of others, but instead it must be shown that a party was unjustly enriched in the sense that the term 'unjustly' could mean illegally or unlawfully." *Id.* at 196 (citation and quotations omitted).

With respect to the three plaintiffs that were Stewart's distributors for more than a decade — Day, Mark VII, and Needham — it is patently obvious that they cannot maintain a claim for unjust enrichment. As discussed above, plaintiffs have no evidence that any of the fees and expenses they allegedly incurred were unreasonable or lacked a valid business purpose. These expenses benefitted both Cadbury and the plaintiffs, and did so over many years. As also noted, there is no evidence that Cadbury promised that the distributorships would not be terminated in

the absence of good cause. No reasonable trier of fact could find, under the circumstances of this case, that it is inequitable for Cadbury to retain the benefit of these plaintiffs' efforts to develop the Stewart's brand — efforts from which plaintiffs themselves benefitted quite handsomely.

The two plaintiffs that were Stewart's distributors for only a few years — Sandstone and Rohlfing — argue that Cadbury brought them on as distributors while at the same time secretly planning to bring its distribution in-house, and that this was an unfair attempt to exploit these distributors to expand the market for Stewart's almost entirely to benefit Cadbury. The Court need not address this argument, though, as Sandstone and Rohlfing were parties to fully integrated, written contracts with Cadbury, and thus Sandstone and Rohlfing are legally barred from bringing a claim for unjust enrichment. *Sterling Capital Advisors, Inc. v. Herzog*, 575 N.W.2d 121, 126 (Minn. Ct. App. 1998) (existence of an express contract between the parties precludes recovery under unjust enrichment). Sandstone and Rohlfing merely performed their obligations under the express contracts; in return, Cadbury performed its obligations under those same contracts. No one was enriched "unjustly."

### E. Tortious Interference with Contract and Prospective Business Relations

Under Minnesota law, to prevail on a claim of tortious interference with an existing contract, a plaintiff must show: (1) the existence of a contract; (2) that the defendant knew of the contract; (3) that the defendant intentionally procured a breach of the contract without justification; and (4) damages. *Howard v. Minn. Timberwolves Basketball Ltd. P'ship*, 636 N.W.2d 551, 559 (Minn. Ct. App. 2001). To prevail on a claim of tortious interference with prospective business relations, a plaintiff must show: (1) that it had a reasonable expectation of economic advantage or benefit; (2) the defendant knew of that expectation; (3) the defendant

wrongfully interfered with the expectation without justification; (4) causation; and (5) damages. *Lamminen v. City of Cloquet*, 987 F. Supp. 723, 731 (D. Minn. 1997), *aff'd as modified*, 162 F.3d 1164 (8th Cir. 1998) (per curiam). In their sparse briefing on these claims, plaintiffs do not identify any existing or prospective contracts with any specificity, and thus their claims must fail. *See R&A Small Engine*, 2006 WL 3758292, at *4 (plaintiff must establish that wrongful conduct affected a specific relationship; mere loss of unspecified business is not sufficient to establish interference with prospective business relations); *Sports & Travel Mktg., Inc. v. Chicago Cutlery Co.*, 811 F. Supp. 1372, 1382-82 (D. Minn. 1993) (dismissing claim for tortious interference with existing contract because plaintiff failed to identify any existing contract).

### F. Equitable Estoppel

Plaintiffs argue that Cadbury should be equitably estopped from terminating its relationships with them. An equitable-estoppel claim arises when

> one by his acts or representations, or by his silence when he ought to speak, intentionally or through culpable negligence, induces another to believe certain facts to exist, and such other rightfully acts on the belief so induced in such manner that if the former is permitted to deny the existence of such facts it will prejudice the latter.

*Birch Publ'ns, Inc. v. RMZ of St. Cloud, Inc.*, 683 N.W.2d 869, 873-74 (Minn. Ct. App. 2004) (citation and quotations omitted). To prevail on a claim of equitable estoppel, a plaintiff must establish that: (1) the defendant made a promise or inducement; (2) the plaintiff reasonably relied on the promise or inducement; and (3) the plaintiff will be harmed if the defendant is not estopped. *Id.* at 873.

Plaintiffs argue that Cadbury induced them into making significant investments on Cadbury's behalf and enticed them with promises of substantial profits while at the same time

secretly planning to terminate them. But for estoppel to apply, plaintiffs must identify a specific promise or inducement that led them to believe that they would not be terminated without good cause and on which they actually relied in making a particular investment. Plaintiffs have not identified any such promise or inducement, nor have they presented sufficient evidence of actual reliance, and thus their claim must fail.

### G. Breach of Good Faith and Fair Dealing

Under Minnesota law, every contract includes an implied covenant of good faith and fair dealing. *In re Hennepin County 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502 (Minn. 1995). Under that implied covenant, one party may not "unjustifiably hinder" the other party's performance of the contract. *Id.* But the implied covenant cannot be used to prevent a party from properly exercising its rights under the contract — including its right to terminate an at-will distributorship agreement. *Cf. Vick v. Nw. Publ'ns, Inc.*, No. C3-90-978, 1990 WL 152696, at *2 (Minn. Ct. App. Oct. 16, 1990) (no breach of good faith in terminating distributorship agreement pursuant to express terms of the contract). Cadbury had the right to terminate both the written and unwritten distributorship agreements at will; Cadbury's exercise of its rights under the contracts therefore did not "unjustifiably hinder" plaintiffs' performance. Cadbury's motion for summary judgment on plaintiffs' good-faith claim is granted.

### ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Defendant Nantucket Allserve, Inc.'s motion for summary judgment [Docket No. 25] is GRANTED.

2.	Plaintiffs' amended complaint [Docket No. 19] is DISMISSED WITH

PREJUDICE AND ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: July 25, 2008

s/Patrick J. Schiltz<br>Patrick J. Schiltz<br>United States District Judge